UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DURELL T. CRAIN,

       Plaintiff,

       v.

CHRISTINA REAGLE, et al.,

       Defendants.

CAUSE NO. 3:25-CV-95-PPS-JEM

OPINION & ORDER

On February 10, 2025, I issued an order (ECF 8) granting Durell T. Crain, a

prisoner without a lawyer, leave to proceed against Warden Smiley in his official

capacity to obtain permanent injunctive relief to protect him from attacks by other

inmates, as required by the Eighth Amendment. I took all of Crain's other claims under

advisement to be screened, as required by 28 U.S.C. § 1915A, at a later date. Crain also

sought preliminary injunctive relief. I ordered briefing on the request, and I denied

preliminary injunctive relief following briefing. ECF 48. I stayed this case pending

screening of the remainder of the amended complaint. *Id.*

Crain's Many Requests for Emergency Relief and this Court's Order to Show Cause

By April 22, 2025, Crain had filed ten documents with the court that were labeled

as emergencies, including two filed after I issued my order denying Crain's request for

injunctive relief. ECF 1; ECF 4; ECF 5; ECF 15; ECF 18; ECF 37; ECF 42; ECF 46; ECF 49;

ECF 50. Crain was told to stop filing emergency motions multiple times. *See* ECF 17,

ECF 19, ECF 48. On April 22, 2025, I ordered Crain to show cause why this case should

not be dismissed as a sanction for continuing to file frivolous emergency motions and

abusing the judicial process, despite multiple warnings. ECF 52. He responded, and

then he filed an amended response a few days later. ECF 55; ECF 56. His amended

response, however, fails to take responsibility for his actions. Instead, Crain blames

attempts by prison officials to move him for "causing him to write emergency motions

to this court to stop them from placing his health/life in danger." ECF 56 at 4-5.

After I ordered Crain, on April 22, to show cause why his case should not be

dismissed, Crain stopped filing motions that were titled as emergencies for a time.[1] But,

before I made a ruling on the order to show cause, Crain filed a motion on August 1,

2025, reporting that he had been moved to a location with more smoke and again

seeking injunctive relief. *See* ECF 67. And, on October 21, 2025, he filed an "Emergency

Motion to Lift Stay & Screen Emergency Prisoner Complaint in Case No. 3:25-CV-95."

ECF 77. He filed another emergency motion on November 20, 2025, titling this one an

"Emergency Motion to Reopen Preliminary Injunctive Relief Under Federal Rule of

Civil Procedure 60(b) with Exhibit's Attached and to Take Judicial Notice." ECF 84. On

January 22, 2026, Crain filed an "Emergency Motion for Court to Make Order on

Emergency Motion to Reopen Preliminary Injunctive Relief." ECF 92.

Crain's requests for emergency injunctive relief were not limited to those filed in

this case. In *Crain v. Centurion Health*, 3:24-CV-984-HAB-APR (filed Dec. 13, 2024), Crain

---

[1] Crain filed a motion seeking injunctive relief that was filed on April 23, 2025, but it appears that it was signed on April 21, 2025, before this court's order to show cause was entered. ECF 53.

filed an emergency motion on July 15, 2025. Chief Judge Holly A. Brady denied the

motion as inappropriate, noting that, while the case was being dismissed for failure to

state a claim, Crain's "willful persistence in violating the court's order that he stop filing

such motions would be a sufficient basis to dismiss this case." *Id.* (ECF 27 at 12).

Unsatisfied with my ruling on his request for preliminary injunctive relief in this

case, Crain initiated a new lawsuit by submitting another emergency complaint on

April 29, 2025. *Crain v. Arnold*, 3:25-CV-380-PPS-JEM. The new complaint sought

essentially the same relief that Crain sought in this case, and it was filed just seven days

after I ordered Crain to show cause why this case should not be dismissed for

continuing to submit frivolous requests for emergency relief. Crain's new case named

the Indiana Department of Correction ("I.D.O.C.") Commissioner as a defendant after I

had explained to Crain in this case why this was not necessary and denied his motion

asking to substitute the commissioner for the warden. *See* ECF 48 at 6. On July 15, 2025,

I found that the portion of the newly filed complaint that duplicated the claims raised

here was a malicious duplicate. *Crain v. Arnold*, 3:25-CV-380-PPS-JEM (ECF 12 at 3).

Crain was not deterred. He filed an emergency motion in the new case on July 13, 2025.

*See* ECF 13. He filed additional emergency amended complaints on July 18, 2025,

August 20, 2025, and December 8, 2025. *See* ECF 16, ECF 20, and ECF 36.

Crain also initiated another new case by filing what he titled as an "Imminent

Danger Emergency Prisoner Complaint" on September 30, 2025. *Crain v. Arnold*, 3:25-

CV-827-PPS-APR (filed Sept. 30, 2025). This case is also about Crain's alleged exposure

to smoke, although the emphasis is on his medical care. Two weeks later, he filed an

emergency motion in this case too. *Id.* at ECF 4. A month after that, he filed a "Motion

for Court to Take Judicial Notice of Emergency Motion to Order Lloyd

Arnold/Centurion Staff to Take CT Scan/Find Accurate Diagnosis & Care for

Diagnosis of Organs & Motion for Court to Order Lloyd Arnold & or Warden to Order

Centurion Psychologist to Answer Health Care Request & Evaluate Plaintiff & Order

Lloyd Arnold & or Warden to Order Centurion Medical Staff to Immediately Act on

Emergency Health Care Request." ECF 13.[2]

When Judge Damon R. Leichty dismissed one of Crain's cases as a sanction on

July 25, 2025, for repeatedly filing frivolous emergency motions in a case that the court

had made clear to Crain did not include a claim for injunctive relief, I thought Crain

might learn from the sanction. *See Crain v. Carter*, 3:23-CV-262-DRL-JEM (ECF 120; ECF

121). That has not proven true.

Nevertheless, because Crain reported that he had been moved to a different cell

house and claimed that this again left him exposed to danger of physical attack, I will

defer ruling on my order to show cause (ECF 52) *for now*. It is with this backdrop that I

screen Crain's amended complaint in this case.

Crain's Amended Complaint

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint,

however inartfully pleaded, must be held to less stringent standards than formal

---

[2] The is not an exhaustive list of Crain's emergency motions since I issued the order to show
cause, but I am not going to spend additional time documenting each of Crain's emergency filings.

pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28 U.S.C. § 1915A, I must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

*Crain's Allegations Related to his Incarceration at Indiana State Prison*

Crain's amended complaint names twenty different defendants and includes allegations occurring at two different facilities. ECF 9. The amended complaint contains unrelated claims and assumes my familiarity with many matters outside of the amended complaint. Crain presents a dizzying array of allegations that, in short, reflect his beliefs that: (1) each of the defendants has somehow facilitated a plot to murder him; (2) he is currently in danger; and (3) the only possible way to keep him safe is to house him in a different state entirely without letting anyone other than central office and transport staff know where he is being placed.

Crain discusses a case he litigated in the United States District Court for the Southern District of Indiana, where the I.D.O.C. allegedly agreed that he would remain in a one-man cell in a Protective Custody Unit ("P.C.U.") for the remainder of his incarceration due to an alleged plot to murder him. *See Crain v. Seiver,* 1:22-CV-788-JMS-MG (S.D. Ind. filed Apr. 21, 2022). Crain never meaningfully describes why he believes there is a plot to murder him or who is behind that plot.

He alleges that the individuals he is suing at the Indiana State Prison ("I.S.P.")

plotted to have him removed from protective custody. He was allegedly subjected to a

false conduct report while at I.S.P. He was found guilty, but the guilty finding was

overturned after Crain filed a habeas petition. He was then subjected to other false

conduct reports, but he believes his sanctions, which did not include a loss of good time

credit, were designed to prevent him from challenging the finding of guilt through a

habeas petition. Crain complains that an inmate who, at some unspecified time in the

past, allegedly cut him while saying "die so [I] can get paid" was allowed to remain in

the protective custody unit at I.S.P. Crain attempted to stay under key-lock status

because he was afraid of this inmate, but an unidentified correctional officer left Crain's

door open during a heated argument, which caused Crain to be involved in a fight and

charged with a conduct violation. That conduct violation led to him being transferred to

the restrictive housing unit at Westville Correctional Facility ("W.C.F."). According to

the complaint, Joseph Schnieder, Warden Ron Neal, Ms. Smith, and Deborah Reasoner

each conspired to have Crain removed from the P.C.U. at I.S.P. And, Crain speculates

that Joseph Schneider knew an inmate who posed a threat to Crain would also be

housed at W.C.F.

Crain's allegations that these defendants conspired against him appear to be

based on nothing more than speculation. *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir.

2009) ("mere suspicion that persons adverse to the plaintiff had joined a conspiracy

against him or her [i]s not enough."). But, the shortcomings of Crain's claims against

individuals who allegedly conspired to have him removed from protective custody at

6

I.S.P. need not be addressed here. As noted earlier, I previously allowed Crain to

proceed in this case on a claim against Warden Smiley in his official capacity to obtain

permanent injunctive relief to protect him from attacks by other inmates, as required by

the Eighth Amendment. Crain's claims regarding things that happened at I.S.P. are not

sufficiently related to his allegations about what occurred once he arrived at W.C.F. to

proceed in a single case. "Unrelated claims against different defendants belong in

different suits . . .." *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). *See also Owens v.*

*Evans*, 878 F.3d 559, 566 (7th Cir. 2017). Therefore, the defendants who allegedly

conspired to have Crain removed from protective custody while he was at I.S.P. (I.S.P.

Warden Ron Neal, I.S.P. Unit Team Manager Joseph Schnieder, I.S.P. DHB Hearing

Officer Ms. Smith, and I.D.O.C. Appeal Review Officer Deborah Reasoner) will be

dismissed pursuant to Federal Rule of Civil Procedure 21.[3]

Crain is also suing Jack Hendrix, Derek Chrisitan, James Basinger, and Christina

Reagle for their alleged participation, while Crain was at I.S.P., in making decisions

about where inmates in need of protective custody are housed. Thus, they too will be

dismissed pursuant to Rule 21. This case will focus on matters that occurred after Crain

arrived at the Westville Control Unit ("W.C.U.") on September 6, 2024.

---

[3] These claims may also be barred by *res judicata*, but that is not a matter that needs to be addressed in this case. *See Crain v. Neal,* 3:23-CV-262-DRL-JEM (filed April 3, 2023).

*Crain's Allegations Related to his Incarceration at the Westville Control Unit*

After Crain's transfer to the W.C.U., while being transported to the shower, he learned that he was being housed in the same unit as an inmate Crain believes was somehow involved in the alleged plot to kill him.[4] On October 30, 2024, Crain submitted a grievance about being housed near this inmate. He alleges that inmates tell correctional officers that Crain lied about the inmates, and that officers side with the inmates and also claim that Crain is lying. Then, when someone discusses the alleged plot to murder Crain, the officers cheer the inmates on, although they deny doing this later. C.O. Clemonds, C.O. Whitticker, C.O. Gram, and Sgt. Burk allegedly tell the inmates about things Crain has included in other communications, specifically things he has submitted through an I.D.O.C. Tips reporting line. He further asserts that correctional officers tell inmates that Crain is a rat to persuade them to kill Crain. According to Crain, Captain Rippe and Unit Team Manager ("U.T.M.") Tracy Cornett know that their officers are sharing information with inmates so that the inmates will kill him. Despite this knowledge, Captain Rippe and U.T.M. Cornett allegedly continue to share information with officers, including C.O. Clemonds, Sgt. Burk, C.O, Whitticker, and C.O. Gram.

Crain also alleges that officers inform inmates of what he has included in his court filings.[5] Although Crain doesn't provide any specifics such as who, when, where,

---

[4] Crain does not identify this inmate other than by noting he was a member of the Vice Lords.

[5] Crain filings in this court are a matter of public record.

or what was said, he alleges generally that these officers hear threats from inmates to kill Crain and his family, but they do nothing.

Crain also notes that he has chest pain due to asthma, and that Warden Smiley knows smoke aggravates his symptoms.[6] Inmates allegedly know this too because they can view court filings concerning Crain on their tablets. At some point (Crain doesn't say when) Sgt. Burk moved an inmate that Crain believes poses a threat to him to a nearby cell. Crain alleges that Captain Rippe and U.T.M. Cornett responded and moved Crain to a different pod. But Crain continued to write to the I.D.O.C. Tips line to complain about officers and file grievances against officers. Crain alleges that, because of those continued complaints, Captain Rippe and U.T.M. Cornett moved the offender back to Crain's block.

On January 16, 2025, Crain's neighbor allegedly talked with this inmate, several kites were passed to inmates on the block, and smoke became heavier from inmates keeping their "wicks" lit. ECF 9 at 9. These are apparently rolled up pieces of toilet paper. Crain submitted an emergency grievance that night to Warden Smiley and Ms. Smith.[7] On January 17, 2025, Crain gave a duplicate copy of the emergency grievance to C.O. Henrich, who said he gave it to Captain Rippe. Crain also indicates that he told C.O. Henrich he was suicidal. Crain flooded his cell because he didn't feel C.O. Henrich

---

[6] Crain acknowledges that this issue was litigated in 3:24-CV-984-HAB-APR. Crain has also included claims against Warden Smiley relating to his medical care in 3:25-CV-827-PPS-APR. His allegations regarding Warden Smiley's knowledge of his medical needs is included here only as background to assist in understanding the nature of Crain's claims.

[7] While Crain has named a Ms. Smith as a defendant, he identifies that person as a Disciplinary Hearing Board Officer at I.S.P. Thus, it seems that this individual, who was contacted while Crain was at W.C.F., is not the same individual that Crain named as a defendant in this action.

and other officers were taking his complaints about being unable to breathe seriously. He heard an inmate from a lower range laugh and say, "now that's how you smoke out a rat." ECF 9 at 9. Crain complained that he was suicidal, and he was moved to a cell that was two doors down. When Crain complained that the inmate would still try to "smoke [him] out," C.O. Henrich allegedly told Crain to "deal with it." *Id.* On the night of January 17, 2025, Crain indicates that inmates tried to "smoke [him] out," which he describes as an attempt to kill him. *Id.* Feeling ignored again, he told correctional officers that he was suicidal, and he was then removed from his cell, which he notes has solid doors.

Crain spoke with Nurse Hickman. He indicates that he previously wrote to internal affairs about her because she said inmates were "big mad" at Crain and wanted to kill him and he "deserve[d] it." ECF 9 at 9. Lt. Robinson and other officials were there. He explained to them that he believed inmates were attempting to kill him by keeping wicks lit and making it smokey. He also told them that he would kill himself before allowing the inmates to do so. He asked Lt. Robinson to take him to receiving, where there is no smoking and inmates are sometimes held for suicide observation, until Captain Rippe and U.T.M. Cornett returned. Lt. Robinson said receiving was full, so, she was going to put Crain back in his cell without his property and assign him a suicide companion. He wanted to keep his inhaler. Lt. Robinson initially said no, but Nurse Hickman said he could keep it, and Lt. Robinson then agreed he could keep it. When Crain asked for a breathing treatment, Nurse Hickman said she would give him a breathing treatment if he didn't go on suicide watch. Crain agreed and received a

10

breathing treatment. But as he considered it more, he felt he needed to go on suicide watch so he would have a suicide companion who could get help if he passed out from the smoke or tried to commit suicide. After that, Nurse Hickman allegedly decided that Crain could not keep his inhaler, and she also didn't allow him to use it when staff called and requested that it be brought for him to use. Crain had pain in his lungs and trouble breathing all night. On the morning of January 18, 2025, Crain was moved to receiving by Lt. Davilla.[8] He allegedly learned that Lt. Robinson had lied and there was space for him in receiving the previous night.

On January 21, 2025, Crain asserts that he overheard a conversation between Captain Rippe and an unidentified officer. The officer was allegedly crying about how he didn't want to be charged with murder. Captain Rippe allegedly said "didn't I say Friday I got this?" ECF 9 at 10. Friday would have been January 17, 2025, the date Crain gave C.O. Henrich the emergency grievance, so Crain speculates that this conversation was about him and his grievance.

On January 21, 2025, Captain Rippe and U.T.M. Cornett met to discuss where Crain should be housed. Even though they allegedly knew that Crain believed inmates were trying to kill him, they decided to send him back to his cell. Crain saw someone from mental health and explained that inmates were trying to kill him. Crain showed the mental health worker where he had cut his arm. The mental health worker approved Crain being sent back to his cell.

_____

[8] Lt. Davilla is not a defendant in this action.

Captain Rippe came into receiving and Crain told him that inmates were trying to kill him with the wicks; Captain Rippe allegedly responded with "that's how you smoke a rat out." ECF 9 at 11. He ordered Lt. Talbott to move Crain back to the same block. When Lt. Talbott told Crain it was time to move, Crain explained that inmates were trying to kill him, Lt. Talbott said that he had to go back to his cell or officers would be called to make him go. Crain moved back to his cell on January 21, 2025.

On January 27, 2025, Crain reports that he had to be removed from his cell due to smoke, which he construes as another attempt to kill him.[9] He complained because he was placed next to a gang leader that he felt posed a threat to him. He was moved to A-pod by C.O. Clemonds and Sgt. Burk the next day. After new tablets were distributed on January 29, 2025, Crain heard an inmate say they were going to smoke him out, but another inmate said not to do it because it would smell.

On January 27, 2025, Crain also asked for a transfer by filing a classification appeal by inter-facility mail to Warden Smiley and U.S. Mail to Christina Reagle/Classification Director. The January 27, 2025, classification appeal described Crain's situation and asked for a transfer to Wabash SHU. Crain believed the open cells there would allow air to pass through, and he felt the risk of being spat at or having

---

[9] "On 1-27-2025 I had to be removed from the attempts to try & Kill me again, due to the continuing information being given by officers to inmates, from the lighting of wicks and Keeping them lit." ECF 9 at 11.

urine and feces thrown at him was preferable to "not being able to breath and [dying]." ECF 9 at 13.[10]

On January 31, 2025, an unidentified inmate who was recently moved started yelling about what Crain wrote to his lawyer and how Crain was dead. Crain asserts that C.O. Clemonds and Sgt. Burk continued to tell inmates that Crain is a rat and a snitch. Crain believes this was done to persuade inmates to kill him. He further alleges that C.O. Clemonds and Sgt. Burk continue to bring inmates into the pod who are familiar with Crain's history and can tell other inmates about the alleged plot to murder him.[11]

Craim seeks monetary damages and "transfer to a[n] out-of-state prison not attached to the State of Indiana or near the State" where he wishes to be placed in a one-man cell in a protective custody unit. He also wants the cases mentioning the alleged

---

[10] He does not provide any additional information about his classification appeal. However, as I noted in screening Crain's amended complaint in 3:25-CV-827-PPS-APR (ECF 25 at 14), "Crain is entitled to be housed in a manner that is consistent with the Eighth Amendment, but Crain isn't entitled to any particular classification or prison assignment. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin*, 515 U.S. at 486)."

[11] Crain also alleges that C.O. Clemonds and Sgt. Burk denied him breathing treatments to retaliate against him, but he does not link this allegation to any particular protected First Amendment Activity. Furthermore, he is already proceeding against C.O. Clemonds and Sgt. Burk for retaliating against Crain by refusing to transport him to receive breathing treatments ordered by Crain's health care providers, in retaliation for filing a lawsuit in January 2025. *See Crain v. Smiley*, 3:25-CV-380-PPS-JEM (ECF 35).

To the extent that Crain may have intended to allege that C.O. Clemonds and Sgt. Burk violated the Eighth Amendment by refusing to transport him to the medical department for breathing treatments, his allegations are too vague to state a claim. Under the Eighth Amendment, deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). Crain has not included allegations from which it could be plausibly inferred that C.O. Clemonds or Sgt. Burk were deliberately indifferent to his medical needs.

murder plot to be made inaccessible to inmates who use their tablets to conduct legal research. He doesn't want any I.D.O.C. staff to know where he is being transferred to except central office and those transporting him.

Analysis of Crain's Claims Related to Westville Correctional Facility

*Failure to Protect*

It appears Crain is asserting that Captain Rippe, U.T.M. Cornett, C.O. Clemonds, C.O. Whitticker, C.O. Gram, Sgt. Burk, Warden Smiley, C.O. Henrich, and Lt. Talbott have each failed to protect him from attacks by inmates. Prison officials must "take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A violation occurs only where "deliberate indifference by prison officials effectively condones the attack by allowing it to happen." *Hale y v. Gross*, 86 F.3d 630, 640 (7th Cir. 1996). Liability turns on what the defendant knew. Where a defendant is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and draws such an inference, there may be liability." *Farmer*, 511 U.S. at 837. But "poor judgment" isn't enough. There must be a conscious disregard of a known risk. *Lewis v. Richards*, 107 F.3d 549, 554 (7th Cir. 1997). Thus, "a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk." *Gevas v. McLaughlin*, 798 F.3d 475, 481 (7th Cir. 2015).

14

Here, however, the only "attacks" that Crain references are two instances where inmates were allegedly smoking or burning toilet paper knowing that it would bother Crain and possibly aggravate his respiratory problems. Assuming for purposes of this order that inmates did deliberately smoke or burn toilet paper, it cannot be plausibly inferred that this amounted to a specific, credible, and imminent risk of serious harm. Furthermore, it cannot be plausibly inferred that these defendants were aware of a specific assailant who was perpetrating the alleged "attack." Crain's allegation that inmates are attempting to murder him by burning toilet paper or smoking illicit substances is simply too far-fetched to support a claim that these defendants failed to protect him from an attack by an inmate.

The defendants' alleged actions may have placed Crain at greater risk of being attacked, but mere fear of an attack that does not occur does not state a claim for failure to protect. *Doe v. Welborn*, 110 F.3d 520, 523–24 (7th Cir. 1997) ("An allegation that prison officials exposed a prisoner to a risk of violence at the hands of other inmates does not implicate the Eighth Amendment's Cruel and Unusual Punishments Clause." (internal quotation marks and citation omitted)). Therefore, Crain may not proceed against Captain Rippe, U.T.M. Cornett, C.O. Clemonds, C.O. Whitticker, C.O. Gram, Sgt. Burk, Warden Smiley, C.O. Henrich, and Lt. Talbott for failing to protect him.

*Retaliation*

Crain alleges that Captain Rippe and U.T.M. Cornett moved an offender that Crain had identified as posing a risk to his safety into Crain's block as retaliation for

15

submitting information to the I.D.O.C. Tips line and complaining about officers. To state a First Amendment retaliation claim, an inmate must allege: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Whitfield v. Spiller*, 76 F.4th 698, 707–08 (7th Cir. 2023) (citation omitted). Here, giving Crain's the benefit of all favorable inferences he is entitled to at this stage of the proceedings, he has stated a retaliation claim against Captain Rippe and U.T.M. Cornett.

Crain is also suing Nurse Hickman. He alleges that he wrote to internal affairs about Nurse Hickman after she claimed inmates were "big mad" at Crain and wanted to kill him, and that he "deserve[d] it." ECF 9 at 9. He further alleges that, on January 17, 2025, when he was suicidal and believed that inmates were trying to kill him, he was placed in a cell without his property. He asked to keep his inhaler, and Nurse Hickman initially agreed to this but later changed her mind, leaving Crain without access to his inhaler overnight, knowing that he believed inmates were trying to kill him by smoking or burning toilet paper near him. Giving Crain the benefit of all favorable inferences, I will allow him to proceed against Nurse Hickman on a retaliation claim.

*Allegedly Inadequate Investigation*

Crain is suing U.T.M. Cornett and Captain Rippe because they have allegedly failed to conduct an honest investigation into the alleged plot to murder him. Crain

16

doesn't have a right to have another inmate's alleged wrongdoing investigated or prosecuted. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence . . . a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 865 (7th Cir. 1998) ("[C]riminal prosecution is an executive function within the exclusive prerogative of the Attorney General."). Therefore, he may not proceed against U.T.M. Cornett or Captain Rippe for conducting an inadequate investigation into his allegations that there is a plot to murder him.

*Crain's Remaining Defendants*

Crain has named Lt. Robinson as a defendant, but his only allegation against her is that she allegedly lied about a cell being available in the receiving area when Crain requested to be moved there on January 17, 2025. While morally reprehensible, lying – without more - does not violate the Constitution.

He has also sued a Jane Doe Mental Health Doctor. The only mention of a mental health worker in the complaint is someone who Crain talked with on January 21, 2025. After Crain explained that inmates were trying to kill him, the mental health worker approved Crain being sent back to his cell. It cannot be plausibly inferred from the facts alleged in the complaint that the mental health worker failed to use her medical judgment in assessing the appropriateness of clearing Crain to be sent back to his cell. Therefore, I will not allow Crain to proceed against the Jane Doe Mental Health Doctor at W.C.U.

<u>Crain's Requests for Permanent and Preliminary Injunctive Relief</u>

As noted earlier in this order, I initially allowed Crain to proceed against Warden Smiley in his official capacity to obtain permanent injunctive relief to protect him from attacks by other inmates, as required by the Eighth Amendment. Crain, however, has recently been moved to the Newcastle Correctional Facility. In light of Crain's placement in a different facility, his claim for permanent injunctive relief is moot, as are his several requests for preliminary injunctive relief. *See Higgason v. Farley*, 83 F.3d 807, 811 (7th Cir. 1996) ("If a prisoner is transferred to another prison, his request for injunctive relief against officials of the first prison is moot unless he can demonstrate that he is likely to be retransferred."). Therefore, each of Crain's pending motions seeking preliminary injunctive relief (ECF 67; ECF 77; ECF 84; ECF 92; ECF 97) will be denied.

I understand that, following his transfer to Newcastle Correctional Facility, Crain continues to believe he is not safe. However, I have limited this case to Crain's safety at the Westville Correctional Facility. So far, Crain's allegations regarding his safety at Newcastle Correctional Facility appear to be based on nothing more than speculation about what could possibly happen in the future. Nonetheless, if Crain believes he can state a claim based on his conditions at Newcastle Correctional Facility, he will need to assert that claim in a separate case filed in the United States District Court for the Southern District of Indiana.

For these reasons, the court:

(1) DEFERS RULING on this court's order to show cause (ECF 52);

(2) LIFTS the STAY ordered on April 14, 2025 (ECF 48);

(3) DENIES each of Durell C. Crain's requests for preliminary injunctive relief (ECF 67; ECF 77; ECF 84; ECF 92; ECF 97);

(4) DISMISSES WITHOUT PREJUDICE I.S.P. Warden Ron Neal, I.S.P. Unit Team Manager Joseph Schneiter, I.S.P. DHB Hearing Officer Mr. Smith, I.D.O.C. Appeal Review Officer Deborah Reasoner, I.D.O.C. Director of Classification Derek Christian, I.D.O.C. Executive Classification Director Jack Hendrix, I.D.O.C. Deputy Commissioner James Basinger, and I.D.O.C. Commissioner Christina Reagle, pursuant to Federal Rule of Civil Procedure 21;

(5) GRANTS Durell C. Crain leave to proceed against U.T.M. Tracy Cornett and Captain Rippe in their individual capacities for compensatory and punitive damages for retaliating against Crain for calling the I.D.O.C. Tips line and complaining about officers by moving an inmate that Crain believed to be a threat to his safety into the same block, in violation of the First Amendment;

(6) GRANTS Durell C. Crain leave to proceed against Nurse Hickman in her individual capacity for compensatory and punitive damages for retaliating against Crain for reporting her to internal affairs by refusing to let him have his inhaler in his cell or have access to it upon request on January 17, 2025, knowing that Crain believed inmates were smoking or burning toilet paper near his cell in an effort to kill him, in violation of the First Amendment;

19

(7) DISMISSES all other claims;

(8) DISMISSES Warden Smiley, C.O. Clemonds, Sgt. Burk, C.O. Whitticker, C.O. Gram, C.O. Henrich, Lt. Robinson. Lt. Talbott, and Mental Health Doctor Jane Doe;

(9) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) U.T.M. Tracy Cornett and Captain Rippe at the Indiana Department of Correction, with a copy of this order and the amended complaint (ECF 9);

(10) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Nurse Hickman at Centurion Health of Indiana, LLC, with a copy of this order and the amended complaint (ECF 9); and

(11) ORDERS, under 42 U.S.C. § 1997e(g)(2), U.T.M. Tracy Cornett, Captain Rippe, and Nurse Hickman to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED.

ENTERED:  March 3, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT